**UTICA MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**HALL EQUIPMENT, INC., William B. Riddell Elaw Corporation Weathermark Investments, Inc. f/k/a Buckley & Scott Co., Inc., Defendants.**

**No. 97–CV–12392–MEL.**

United States District Court, D. Massachusetts.

Oct. 28, 1999.

Lon A. Berk, Wiley, Rein & Fielding, Washington, DC, Russell F. Conn, Conn, Kavanaugh, Rosenthal, Peisch & Ford, Boston, MA, for Utica Mutual Insurance Company, plaintiff.

Richard D. Paster, Paster, Rice & Castleman, Quincy, MA, Stephen W. Riddell, Troutman Sanders LLP, Atlanta, GA, for Hall Equipment, Inc., defendant.

Richard D. Paster, Paster, Rice & Castleman, Quincy, MA, for William B. Riddell, defendant.

James B. White, Concord, MA, for Elaw Corporation, defendant.

Louis N. Massery, Massery, Gillis & Guiney, Boston, MA, for Weathermark Invest fka Buckley & Scott Co., defendant.

## MEMORANDUM AND DECISION

LASKER, District Judge.

Utica Mutual Insurance Company sues Hall Equipment, Inc., its former principal, William B. Riddell, ELAW Corporation, and Weathermark Investments, Inc., f/k/a Buckley & Scott Co., Inc., for a declaration that it has no duty under the insurance policy it issued to Hall to defend or indemnify Hall and Riddell with respect to claims against them made by ELAW and Weathermark. In the underlying actions, ELAW and Weathermark seek to recover losses they allegedly incurred arising out of Hall's repair of a pumping mechanism on Weathermark's property, which caused a release of fuel oil contaminating both Weathermark's property and ELAW's adjacent property.

Utica now moves for partial summary judgment on the grounds that its insurance contract with Hall contains an "absolute pollution exclusion" which bars coverage for all of ELAW's and Weathermark's claims with the exception of Weathermark's claims seeking payments for damage to its piping system. ELAW countermoves for an order declaring that Utica is obligated under the terms of the policy to cover Hall's and Riddell's liabilities for ELAW's property damages.[1] Finally, Hall and Riddell move under Fed.R.Civ.P. 56(f) for an order continuing consideration of Utica's motion until the completion of discovery relating to their claim that Utica is estopped from denying its obligation to indemnify.

### I.

Weathermark operates a home heating oil storage and delivery business at 150

---

1. In ELAW's opposition to Utica's motion for partial summary judgment, ELAW "requests" summary judgment with respect to its claims.

Although ELAW did not file a formal motion, the "request" is treated as a motion.

West Street in Needham, Massachusetts. In April 1994, Weathermark hired Hall to repair a pumping mechanism used to pump fuel from an aboveground storage tank to the loading rack at this facility. In the course of performing the work Hall allegedly damaged the pumping system. As a result of Hall's alleged negligence, on May 2, 1994, over 3,000 gallons of fuel oil was released onto the Weathermark property and then migrated onto and under ELAW's adjacent property at 400 Hillside Avenue, which contains an occupied office building.

ELAW and Weathermark subsequently brought suits, still pending in the Massachusetts courts, in which claims and third-party claims were asserted against Hall and Riddell, alleging, *inter alia*, that Hall negligently repaired the pumping mechanism and, as a result, caused the oil spill. In *ELAW Corp. v. Weathermark Investments, Inc.*, No. 95–1405 (Mass.Super.Ct., Norfolk), ELAW claims over $1.3 million in damages, including legal and other professional fees and expenses. In particular, ELAW alleges that as a result of the May 2, 1994 release it incurred substantial costs in connection with assessing, containing and removing the contamination. It also maintains that it sustained "permanent" property damages at 400 Hillside Avenue.

In Weathermark's case, *Weathermark Investments, Inc. v. Hall Equipment, Inc.*, No. 96–00968 (Mass.Super.Ct., Norfolk), it seeks in excess of $900,000 for costs incurred to date in responding to the release caused by Hall's negligence, including "environmental assessment, containment, and removal costs," as well as compensation for future response costs. In addition, Weathermark demands compensation for the potential diminution in the value of the 150 West Street property, loss of rental income, and loss through-put income.

Weathermark has asserted the same claims (as cross-claims) against Hall and Riddell in the ELAW suit.

At the time Hall performed the repair work for Weathermark, Hall was insured by Utica.[2] The policy consisted of a Commercial General Liability Coverage Part (the "CGL coverage") and a Commercial Property Coverage Part (the "property coverage"). The CGL coverage includes "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." CGL Coverage Form, § I.A.1.a. It also contains a pollution exclusion provision that specifies that there is no coverage for:

Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

\*   \*   \*   \*   \*   \*

Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.* § I.A.2.f.(2).

Utica seeks a declaration that it has no duty under the policy to defend or indemnify Hall and Riddell in connection with the claims asserted by Weathermark and ELAW in the underlying suits. As indicated above, Utica moves for partial summary judgment that subsection f.(2) bars coverage for all of ELAW's and Weathermark's claims, except to the extent that those claims seek payments for damage to Weathermark's piping system.[3]

---

2. Riddell is Hall's principal and is an additional insured under the policy Utica issued to Hall with respect to his activities in connection with Hall's business.

3. In its motion for partial summary judgment, Utica does not contend that it has no duty to *defend* Hall and Riddell in the underlying suits and is not seeking to withdraw from the defense of Hall in those suits. It argues only

■ Utica's motion is allowed to the extent of declaring that subsection f.(2) relieves Utica of its duty to indemnify Hall and Riddell for Weathermark's and ELAW's claims for reimbursement for any "loss, cost or expense" incurred for remedial action taken in response to the May 1994 release of fuel oil at the 150 West Street and 400 Hillside Avenue locations including, but not limited to, the costs of assessment, containment and removal of pollutants as well as related legal and other professional fees (i.e., environmental "response" costs or "remediation" expenses). However, Utica's motion is otherwise denied because subsection f.(2) does *not* preclude coverage for Weathermark's and ELAW's claims for damages, which are separate and distinct from the costs of assessing, containing and removing the contamination, such as "permanent" property damages, diminution in the fair market value of the Weathermark and ELAW properties, loss of rental income, throughput income losses, and related legal and professional fees (i.e., "non-remediation damages"). ELAW's "request" for a declaration that coverage exists for its "property damage" claims against Hall and Riddell is denied. Hall's and Riddell's Rule 56(f) motion is denied.

## II.

*Utica's Motion for Partial Summary Judgment*

Utica contends that subsection f.(2) relieves it of its duty to indemnify Hall and Riddell against all of Weathermark's and ELAW's claims arising out of the May 1994 oil spill except Weathermark's claim for compensation for damages to its piping system.[4] To repeat, subsection f.(2) excludes coverage for:

> that it has no duty to *indemnify* Hall and Riddell in connection with certain claims stemming from the May 1994 release of fuel oil. In fact, Utica represented that it is still defending both Hall and Riddell subject to a reservation of rights in those suits.

Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants....

CGL Coverage Form, § I.A.2.f.(2). Utica relies on the language which specifies that the policy does not cover losses that arise out of "any request, demand or order" that any person *"in any way respond to ...* the effects of pollutants." *Id.* (emphasis added). It argues that because Weathermark's and ELAW's claims against Hall and Riddell arise out of the May 1994 oil spill, those claims constitute "requests" or "demands" that Hall and Riddell "respond to ... the effects of pollutants." It follows, according to Utica, that subsection f.(2) excludes coverage not only for Weathermark's and ELAW's claims for reimbursement for the costs of assessing, containing and removing the oil contamination but also for their claims for related non-remediation damages at the 150 West Street and 400 Hillside Avenue sites resulting from the oil spill.

Weathermark and ELAW respond that even if the clause on its face excludes coverage for their claims, Utica is liable under the so-called "train of events" test articulated in *Jussim v. Massachusetts Bay Ins. Co.*, 415 Mass. 24, 610 N.E.2d 954 (1993). That test provides that if an otherwise covered act of an insured sets in motion a "train" or "chain" of events resulting in damage otherwise excluded by the policy, recovery may nevertheless be had if the covered act was the direct and proximate cause of the excluded damage.

4. Utica concedes that Weathermark's claims seeking amounts for damage to its piping system do not "arise out of" a request that any person "respond to the effects of pollutants." At oral argument, Utica further acknowledged that other non-pollution and non-environmental damages claims are also outside the ambit of the exclusion.

*Jussim,* 415 Mass. at 27, 610 N.E.2d 954. Applying *Jussim,* Weathermark and ELAW allege that the direct and proximate cause of the oil release giving rise to their damages was Hall's negligence, which is a covered risk under the policy. Therefore, they contend that Utica is obligated under *Jussim* to indemnify Hall and Riddell even if the resulting damage is otherwise excluded from coverage by the pollution exclusion.

Weathermark and ELAW also make convoluted arguments that, in any event, a review of the language of subsection f. as a whole—comparing subsection f.(1) with subsection f.(2)—compels the conclusion that their claims against Hall and Riddell are not excluded by the terms of the policy. Subsection f.(1) precludes coverage for:

> "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants . . . .

CGL Coverage Form, § I.A.2.f.(1). However, it only applies to "bodily injury" or "property damage" occurring at certain specified locations or under certain specified conditions including, *inter alia,* premises owned or occupied by the insured or where the insured brought pollutants onto the location in connection with its operations. *See id.* § I.A.2.f.(1)(a)–(d).

Weathermark begins by arguing that subsection f.(1) does not exclude coverage for its claims because Hall's activities giving rise to the release at the 150 West Street site do not fit within the conditions enumerated in f.(1)(a) through (d). Weathermark then contends that the cited conditions which limit f.(1)'s applicability also confine the reach of subsection f.(2). Therefore, according to Weathermark, because none of the enumerated conditions is present, it follows that f.(2), like f.(1), does not relieve Utica of its duty to indemnify Hall and Riddell for Weathermark's claims arising out of the May 1994 oil spill.

In a related vein, ELAW contends that its claims are for "property damages" and, therefore, subsection f.(1), which concerns "property damages," and not f.(2), which addresses "response costs," governs coverage under the policy. ELAW then applies subsection f.(1) to its claims and asserts that because its property at 400 Hillside Avenue is not one of the locations delineated in f.(1)(a) through (d), the exclusion in f.(1) does not cover the property damages it sustained.

ELAW argues, in the alternative, that even if subsection f.(2) reaches its "property damage" claims, it does not preclude coverage because ELAW's loss did not stem from a "request, demand or order" but rather "arose out of" a covered "occurrence"—Hall's negligent repair work. It further claims that, even assuming its lawsuit constitutes a "demand" upon Hall and Riddell, the "losses" it sustained did not derive from that demand but, rather, "arose" out of the covered "occurrence." Therefore, according to ELAW, f.(2) does not apply.

A. *Applicability of the Absolute Pollution Exclusion*

To remind the reader whose eyes may have glazed over at this point, subsection f.(2) specifies that the insurance provided by the policy does not apply to:

> Any loss, cost or expense arising out of any . . . [r]equest, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollution.

CGL Coverage Form, § I.A.2.f(2). A review of this subsection in conjunction with the entire pollution exclusion clause and the policy as a whole supports the conclusion that subsection f.(2) excludes coverage only for those claims against Hall and Riddell that seek reimbursement for the costs of assessing, containing and removing the oil pollution (i.e., environmental "response" costs or "remediation" expenses). The subsection, however, does

not extend to Hall's and Weathermark's losses that are separate and distinct from environmental response costs, such as "permanent" property damages, diminution in the fair market value of Weathermark's and ELAW's properties, loss of rental income, and loss of through-put income (i.e., "non-remediation damages").[5]

This interpretation of f.(2) is confirmed by the fact that the activities enumerated in the subsection—that is, "test[ing] for, monitor[ing], clean[ing] up, remov[ing], contain[ing], treat[ing], detoxify[ing], and neutraliz[ing]"—are limited to environmental "response" activities, which are apparently meant to be illustrative of the types of "losses, costs or expenses" the clause is intended to cover. Accordingly, contrary to Utica's suggestion, the phrase—"in any way respond to ... the effects of pollutants"—does not enlarge the scope of the exclusion beyond Weathermark's and ELAW's claims for environmental "response" costs to include non-remediation damages.

■ Therefore, even though ELAW's and Weathermark's claims for non-remediation damages constitute "demands" upon Hall and Riddell, see *Manufacturers Gasket Company v. Transcontinental Ins. Co.*, No. 93–3108 (6th Cir. Dec. 6, 1993), *reprinted in* 8 Mealey's Litigation Reports: Insurance # 8 (Dec. 21, 1993) (holding that the underlying lawsuit was a "demand" within the meaning of a pollution exclusion provision containing the same language), they are not "demands" that Hall or Riddell "respond to ... the effects of pollu-

tants" within the meaning of f.(2). They do not ask Hall and Riddell to engage in environmental response activities or reimburse Weathermark and ELAW for amounts incurred for remedial action taken in response to the May 1994 release of fuel oil. Accordingly, coverage for these claims is not precluded by the terms of f.(2).[6]

This analysis of subsection f.(2)—that it only bars coverage for environmental "response" costs—is consistent with the decisions of Massachusetts and other courts determining the applicability of identical pollution exclusion provisions. *See e.g., Town of Wakefield v. Royal Ins. Co.*, No. 941570 (Mass.Super.Ct., Middlesex July 20, 1995), *reprinted in* 9 Mealey's Litigation Reports: Insurance # 39 (Aug. 22, 1995) (pollution exclusion precluded recovery for charges incurred to *clean up* and *remove* oil contamination at a water treatment plant arising from an oil spill at the Wakefield High School); *Manufacturers Gasket Co. v. Transcontinental Ins. Co.*, No. 92–1961 (N.D.Ohio Jan. 4, 1993), *aff'd*, No. 93–3108 (6th Cir. Dec. 6, 1993), *reprinted in* 8 Mealey's Litigation Reports: Insurance # 8 (Dec. 21, 1993) (claims for reimbursement for costs incurred to *contain* and *clean up* oil spill caused by allegedly defective product were excluded).

The authorities relied upon by Utica are not contrary and do not support Utica's broad interpretation of the exclusion. First, the majority of the cases cited by Utica concern only the applicability of subsection f.(1) or similar exclusion clauses

---

**5.** Although this conclusion—that subsection f.(2) applies only to Weathermark's and ELAW's claims for environmental "response" costs and does not bar coverage for related non-remediation damages—differentiates between "response" costs and other types of "property damage," it is noteworthy that "response" costs themselves are not ordinarily distinct from "property damage." In fact, the Massachusetts Supreme Judicial Court has held that "clean up" costs incurred in response to property damage were recoverable under an insurance policy that covered "property damage." *See Hazen Paper Co. v.*

*U.S. Fidelity and Guaranty Co.*, 407 Mass. 689, 698–99, 555 N.E.2d 576 (1990).

**6.** In fact, coverage for these claims is most likely governed by subsection f.(1) of the exclusion which (as discussed above) specifies that the policy does not cover " 'property damage' ... arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants," but is restricted to certain specified locations or under certain specified conditions. CGL Coverage Form, § I.A.2.f.(1)(a)–(d).

which, unlike f.(2), directly bar coverage for "property damage" or "bodily injury" arising out of an "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." *See e.g., United States Liability Ins. Co. v. Bourbeau,* 49 F.3d 786, 788 (1st Cir.1995) (soil contaminated by lead paint chips was excluded property damage under pollution exclusion barring recovery for property damage "arising out of actual discharge, dispersal, release or escape of pollutants into or upon land"); *McGuirk Sand & Gravel, Inc. v. Meridian Mut. Ins. Co.,* 220 Mich.App. 347, 559 N.W.2d 93, 97 (1996) (pollution exclusion, which precluded coverage for property damage arising out of an "actual, alleged or threatened discharge, dispersal, release or escape of pollutants," barred recovery for claims alleging that the plaintiff's negligence caused property damage); *Economy Preferred Ins. Co. v. Grandadam,* 275 Ill.App.3d 866, 212 Ill.Dec. 190, 656 N.E.2d 787, 791 (1995) ("property damage" and "bodily injury" claims against insured arising from a mercury spill in neighbor's home were excluded by a pollution exclusion which denied coverage for claims "arising out of the actual alleged or threatened discharge, dispersal, release or escape of pollutants"); *220–55 46th Ave. Owners, Inc. v. Prudential–LMI Commercial Ins. Co.,* No. 93–11549, at 6 (N.Y.Sup.Ct. Mar. 17, 1995), *reprinted in* 9 Mealey's Litigation Reports: Insurance # 28 (May 23, 1995) (f.(1) barred coverage for the plaintiff's losses resulting from an oil spill because petroleum constituted a "pollutant").

Second, several of the decisions relied upon by Utica are inapposite. While subsection f.(2) applies to "*any* request, demand or order," these decisions involve exclusion provisions specifying that coverage is barred for amounts incurred in complying with *governmental* directions or requests to undertake environmental response activities. *See Kimber Petroleum Corp. v. Travelers Indem. Co.,* 298 N.J.Super. 286, 689 A.2d 747, 756 (1996), *cert. denied,* 150 N.J. 26, 695 A.2d 669 (1997) (determining that there was no coverage under a pollution exclusion for DEP mandated clean up costs); *Risner v. American States Ins. Co.,* No. 94–1468 (C.D.Cal. Jan 13, 1995), *aff'd,* Nos. 95–55217, 95–55305, 1996 WL 382321 (9th Cir. July 8, 1996) (holding that exclusion barred recovery for costs incurred in defending an EPA action).

Finally, even the decisions cited by Utica holding that coverage was barred by pollution exclusion clauses identical or substantially similar to clause f.(2) of the Utica policy do not require the broad interpretation sought by Utica. For example, in *Halstead Indus., Inc. v. Home Ins. Co.,* No. 96–03835, (Mass.Sup.Ct., Suffolk Jan. 14 1998), the court held that a clause identical to f.(2) barred recovery for claims arising from release of fuel oil on a third party's property which migrated onto the insured's property. However, the court did not specify whether the claims were limited to seeking costs expended for remedial action or whether they also included claims for non-remediation damages.

Utica's reliance on *Charles E. Thomas Co. v. Transamerica Ins. Group,* 62 Cal. App.4th 379, 72 Cal.Rptr.2d 577 (1998), which involved an exclusion identical to the clause in the Utica policy, is also misplaced. While the clause was not limited to *governmental* directions or requests, the court held that the exclusion only precluded coverage for losses incurred in complying with orders to undertake specific remedial actions from the Los Angeles Fire Department. *Id.* at 579. Moreover, it explicitly rejected the insurer's argument that the provision "should be read as excluding all losses arising out of the pollution not merely all losses arising out of requests, demands or orders to take certain actions with respect to the pollution." *Id.* at 580.

On the other hand, ELAW's and Weathermark's arguments contending that subsection f.(2) does not cover their claims at all are unpersuasive. Ordinary princi-

ples of contract interpretation dictate rejection of Weathermark's argument that the conditions enumerated under subsection f.(1) be grafted onto subsection f.(2). Since those conditions are not set forth more generally under subsection f. but are specifically listed under subsection f.(1) (and only f.(1)) they were clearly intended to limit only to subsection f.(1).

■ ELAW's contention that its claims are outside the scope of subsection f.(2) because they are for "property damages" and not "response costs" is also unconvincing. Although Massachusetts law provides separate statutory provisions for recovery for "response costs" and "property damages," *see Guaranty–First Trust Co. v. Textron, Inc.,* 416 Mass. 332, 338, 622 N.E.2d 597 (1993) (distinguishing between M.G.L., ch. 21E, § 4 which governs "response costs," and § 5, which protects "property damages"), it does not follow that "response costs" and "property damages" are mutually exclusive categories. Thus, even assuming that coverage is not barred by subsection f.(1), the applicability of f.(2) is not foreclosed.

Finally, ELAW's further contention that even if f.(2) is applicable to its claims for "property damage," it does not relieve Utica of its duty to indemnify Hall because ELAW's claims arise out of a covered "occurrence" lacks merit. This argument is based on the rationale underlying the "train of events" test. Accordingly, the argument fails because (as discussed more fully below) the "train of events" test is inapplicable in the context of third-party liability policies.

■ The bottom line is that the scope of the pollution exclusion in f.(2) is limited to precluding coverage for Weathermark's and ELAW's claims for reimbursement for any "loss, cost or expense" incurred for remedial action taken in response to the May 1994 oil spill.

**B. *The "Train of Events" Test or Proximate Cause***

■ The decision of the Massachusetts Supreme Judicial Court in *Jussim v. Massachusetts Bay Ins. Co.,* 415 Mass. 24, 610 N.E.2d 954 (1993), does not help the defendants. In *Jussim,* the SJC, applying the "train of events" test, found coverage for pollution damages under the plaintiff's homeowner's policy, a first-party insurance policy, notwithstanding a pollution exclusion provision, which at first glance appeared to be directly applicable. 415 Mass. at 25, 610 N.E.2d 954. The plaintiff's property was contaminated by fuel oil spilled in the basement of a neighboring home, which had migrated into the soil and wells of the plaintiff's home. *Id.* at 26, 610 N.E.2d 954. Although the policy excluded coverage for "loss ... caused by ... release, discharge or dispersal of contaminants or pollutants," the plaintiff, relying on the "train of events" test, argued that its property damages were caused by the negligence of others for which the policy provided coverage. *Id.*

The SJC agreed, holding that "[i]f [the efficient proximate] cause is an insured risk, there will be coverage even though the final form of the property damage, produced by a series of related events, appears to take the loss outside of the terms of the policy." *Id.* at 27, 610 N.E.2d 954. It then concluded that although the plaintiff's loss "constitute[d] an event excluded under the policy," the negligence of others—a covered risk under the policy— was the efficient proximate cause of the plaintiff's loss and, that, therefore, the plaintiff could recover. *Id.* at 29, 610 N.E.2d 954. The *Jussim* court, however, expressly recognized that application of the "train of events" test could be foreclosed by inserting language excluding coverage for loss caused "directly or indirectly" by pollutants and that "such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss." [7] *Id.* at 30–31, 610 N.E.2d 954.

**7.** Indeed, in cases since *Jussim v. Massachu-*

*setts Bay Ins. Co.,* 415 Mass. 24, 610 N.E.2d

*Jussim* is inapposite here. *Jussim* was decided in the context of a *first-party* insurance policy. First-party policies cover *physical loss or damage to the insured's property*, and protect against "fortuitous losses," that is, losses caused by actions outside of the policyholder's control such as the negligent conduct of others. However, the CGL coverage portion of the Utica policy at issue here is a *third-party* liability policy. Third-party policies are intended to protect the insured from liability for *damage suffered by third parties.*

The Court of Appeals for the First Circuit in *United States Liability Ins. Co. v. Bourbeau*, 49 F.3d 786 (1st Cir.1995), expressly recognized that the "train of events" test is confined to first-party policies and is not applicable in the context of third-party policies.[8] In *Bourbeau*, the insurer sought a declaration, based upon an absolute pollution exclusion provision, that a third-party CGL policy it had issued did not cover losses sustained by third-parties when the insured negligently released contaminated paint chips while performing a painting contract. 49 F.3d at 787. The insured contended that it was entitled to coverage under *Jussim*'s "train of events" test because the cause of the pollution damage was a covered risk—his alleged negligence in the normal course of performing the painting contract—even though the result of his negligence was pollution. *Id.* at 789.

The First Circuit disagreed, distinguishing *Jussim* on two grounds. First, it noted that unlike the "all risk" or first-party insurance policy at issue in *Jussim*, which was "intended to cover fortuitous losses," *id.* at 790, in the insured's circumstances the "fortuitous nature of the loss [wa]s immaterial" both because the policy was a third-party liability policy and because the pollution exclusion was "targeted at pollution regardless of fault, responsibility or causation." *Id.* Second, in *Jussim* the negligence of third parties caused the oil to spill on adjacent property and migrate onto and damage the insured's property while in *Bourbeau* the damage was caused by the insured himself. *Id.* Accordingly, the First Circuit held that the "train of events" test did not apply. *Id.*

In the present case, the CGL coverage portion of Utica's policy, like the policy in *Bourbeau*, is a third-party liability policy. In addition, as in *Bourbeau*, the negligence of Hall, the insured, rather than third parties, caused the release of pollutants resulting in the damage. That the CGL coverage of the Utica policy does not contain language excluding coverage "regardless of fault, responsibility or causation" does not distinguish this case from *Bourbeau*. The discussion in *Bourbeau* concerning the absence of such language was included as further evidence that the fortuitous nature of the loss was immaterial under the policy at issue in that case.[9]

954 (1993), Massachusetts courts have refused to apply the "train of events" test where the policy in question contained language excluding coverage regardless of fault, responsibility or causation. *See e.g. Hanover New England Ins. Co. v. Smith*, 35 Mass.App.Ct. 417, 420–21, 621 N.E.2d 382 (1993) ("[T]he distinction made in this policy between direct losses and ensuing losses cuts across the train of events analysis, separately indicating the legal effect of each successive causal step in the train.").

**8.** That *Jussim*'s "train of events" test is confined to first-party policies is further evidenced by Massachusetts case law applying *Jussim. See Town of Wakefield v. Royal Ins. Co.*, No. 941570 (Mass.Super.Ct., Middlesex July 20, 1995), *reprinted in* 9 Mealey's Litiga-

tion Reports: Insurance # 39 (Aug. 22, 1995) (considering *Jussim*'s "train of events" test but only in connection with the property coverage of the policy and not in connection with the CGL coverage of that same policy). *See also Hanover New England Ins. Co. v. Smith*, 35 Mass.App.Ct. at 420–21, 621 N.E.2d 382 (analyzing *Jussim* in the context of a first-party policy but determining that the policy language at issue effectively cut-off the "train of events" test).

**9.** Although the property coverage of the Utica policy is not at issue in this suit, it is noteworthy that (as distinct from the CGL coverage) it contains a provision entitled "Exclusions" which provides, in pertinent part, as follows:
We will not pay for loss or damage caused *directly or indirectly* by any of the following.

Accordingly, as the *Bourbeau* court observed, to permit recovery under *Jussim* in the context of the third-party CGL policy in this case would "eviscerate the plain language and explicit purpose of the Absolute Pollution Exclusion." [10]   *Id.* at 790.

\*   \*   \*   \*   \*   \*

To conclude, Utica's motion is allowed to the extent of declaring that Utica is not obligated to indemnify Hall and Riddell under section f.(2) of the policy for those claims seeking reimbursement for environmental "response" costs, including, but not limited to, the costs of assessment, containment and removal of pollutants as well as related legal and other professional fees at the 150 West Street and 400 Hillside Avenue locations in connection with the May 2, 1994 oil spill, and is otherwise denied.

*ELAW's Motion for Summary Judgment*

Although ELAW has made no formal motion, it entitles its opposition, in part, as a "request for summary judgment." Its claim appears to be that the May 1994 oil spill was an "occurrence" within the meaning of Section I.A.1 of the policy and therefore because such an "occurrence" took place, Utica is liable to cover ELAW's claims for "property damage." This "request," if intended to be a motion, is denied. There are numerous issues of fact pointed out by Utica and Weathermark, such as, the timing or origin of the contamination, the extent of the contamination, or the causes of the discharge that resulted in the contamination and so forth. Accordingly, ELAW's "request" is denied.

*Hall's and Riddell's Rule 56(f) Motion*

■ Hall and Riddell move under Fed. R.Civ.P. 56(f) for an order continuing consideration of Utica's motion until the completion of discovery relating to their claim that Utica is estopped from denying its obligation to indemnify based upon its oral and written representations to Hall. In particular, Hall seeks discovery directed at uncovering evidence that Utica has interpreted identical or substantially similar pollution exclusion clauses in a manner that is completely inconsistent with the interpretation Utica is currently advancing.

Hall's motion is denied. Even assuming that Utica has advanced inconsistent interpretations of identical or substantially similar pollution exclusions, such evidence is irrelevant and immaterial to the purely legal question raised in Utica's motion for partial summary judgment regarding the breadth of subsection f.(2). *See Resolution Trust Corp. v. North Bridge Assoc.*, 22 F.3d 1198, 1203 (1st Cir.1994) (explaining that a party invoking Rule 56(f) must demonstrate the materiality of the facts sought by discovery to the issues raised on summary judgment). This ruling, however, is without prejudice to Hall and Riddell continuing to pursue their claim that Utica is estopped from denying coverage.

III.

Utica's motion is allowed to the extent of declaring that subsection f.(2) relieves Utica of its duty to indemnify Hall and Riddell for Weathermark's and ELAW's claims for reimbursement for any "loss, cost or expense" incurred for remedial action taken in response to the May 1994 release of fuel oil at the 150 West Street and 400 Hillside Avenue locations including, but not limited to, the costs of assessment, containment and removal of pollutants as well as related legal and other professional fees (i.e., environmental "re-

Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. . . .

**10.** Weathermark's contention that the SJC's decision in *Western Alliance v. Gill*, 426 Mass. 115, 686 N.E.2d 997 (1997), limits the reach

of *United States Liability Ins. Co. v. Bourbeau*, 49 F.3d 786 (1st Cir.1995), is misplaced. *Gill*'s discussion of *Bourbeau* does not concern *Bourbeau*'s analysis of the difference between first- and third-party policies or the applicability of *Jussim*'s "train of events" test.

sponse" costs or "remediation" expenses), and is otherwise denied. ELAW's "request" for summary judgment is denied. Hall's Rule 56(f) motion is denied.

It is so ordered.