75 Mass. App. Ct. 709 (2009)                    709

Clean Harbors Environmental Services, Inc. v. Boston Basement Technologies, Inc.

CLEAN HARBORS ENVIRONMENTAL SERVICES, INC. *vs.* BOSTON BASEMENT TECHNOLOGIES, INC.; ADMIRAL INSURANCE COMPANY, third-party defendant.

No. 08-P-576.

Norfolk. February 6, 2009. - November 9, 2009.

Present: LENK, CYPHER, & MILLS, JJ.

*Insurance,* Coverage, Property damage, General liability insurance, Pollution exclusion clause. *Massachusetts Oil and Hazardous Material Release Prevention Act.*

In an insurance dispute, the District Court judge erred in entering summary judgment in favor of the third-party defendant insurer, on the grounds that the insurer was not liable on a claim by the defendant, its insured, for coverage of the cost of cleaning up an oil spill, performed by the plaintiff at the defendant's request, given that the commercial general liability policy at issue, by virtue of an exception to its pollution exclusion clause, covered the insured's liability in negligence for damage to the property involved (for which the insured would be liable if the statutory require- ment imposing response obligations did not exist), including restoration costs, where such costs constituted an alternative to, or reduction in, dam- ages for diminution in value [712-719]; however, where questions of fact remained as to the damages recovered by the property owner and as to what extent, if any, the plaintiff's services were a component of those dam- ages, this court remanded the matter to the District Court for further proceedings [720-721].

CIVIL ACTION commenced in the Quincy Division of the District Court Department on October 6, 2005.

A third-party complaint, filed on November 14, 2005, was heard by *Mark S. Coven,* J., on a motion for summary judgment.

*Douglas W. Salvesen* for Boston Basement Technologies, Inc.
*Brian R. Birke* for Admiral Insurance Company.

LENK, J. Boston Basement Technologies, Inc. (Basement Tech- nologies), appeals from a summary judgment entered in favor of its insurer, Admiral Insurance Company (Admiral), on Base-

ment Technologies' claim for coverage of the cost of cleaning up an oil spill, performed at its request by Clean Harbors Environmental Services, Inc. (Clean Harbors). We are asked to interpret the meaning of the insurance policy's exclusion for certain pollution cleanup costs and the exception to that exclusion providing coverage for common-law property damage. We hold that certain cleanup costs may be covered as property damage under the exception to the policy's pollution exclusion clause when they constitute an appropriate and reasonable recovery at common law. Questions of fact, however, preclude our determination of coverage for Clean Harbors' services in this case.

1. *Background.* The summary judgment record discloses that in April, 2005, Basement Technologies, while installing a waterproofing system in the home of Richard Silva, broke a heating oil line and caused approximately 150 gallons of heating oil to leak into Silva's basement. The oil collected in a sump pump, which then pumped the oil outside into Silva's yard.

On or about April 21, 2005, Basement Technologies hired Clean Harbors to clean up the oil spill. Clean Harbors thereafter sent Basement Technologies invoices in the amount of $12,638.40. On April 28, 2005, the Massachusetts Department of Environmental Protection (DEP) issued a notice of responsibility to Basement Technologies, pursuant to the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G. L. c. 21E. The notice identified Basement Technologies as a potentially responsible party under the statute, and thereby strictly liable for the costs of remedial response actions incurred at the property. Basement Technologies was instructed to take certain immediate response actions,[1] as well as to submit certain notices and filings for DEP approval, and to hire a licensed site professional "to manage, supervise or actually perform the necessary response actions at this site."

Basement Technologies sought payment of Clean Harbors'

---

[1]The immediate response actions were as follows: "Remove product from the sump bucket"; "[u]se a frac tank or tote to store all water/oil discharged by the sump pump"; "[t]he removal of up to a total of twenty-five (25) cubic yards of impacted media (stone & soil) from the interior and exterior of the basement"; "[a]ll [r]emediation [w]aste must be properly stored/handled and disposed of within 120 days from the date of generation per 310 [Code Mass. Regs. §] 40.0030."

invoices under its commercial general liability policy with Admiral. Admiral denied coverage. Clean Harbors' invoices went unpaid, and Clean Harbors brought this action against Basement Technologies in District Court. Basement Technologies filed a third-party complaint against Silva, the property owner, who asserted a counterclaim in negligence against Basement Technologies for damages and cleanup costs associated with the oil spill. Basement Technologies also filed a third-party complaint against Admiral, seeking defense and indemnification. Admiral agreed to defend Basement Technologies against Silva's counterclaim under a reservation of rights, based on the potential for nonremediation property damage. Admiral denied coverage for Clean Harbors' claims.

Clean Harbors and Basement Technologies settled, and Basement Technologies sought reimbursement from Admiral for the settlement costs. Admiral moved for summary judgment based on the pollution exclusion clause in the policy. A District Court judge allowed the motion, reasoning in a thoughtful memorandum that Clean Harbors' services constituted environmental response costs, which were excluded under the policy. Basement Technologies appealed to the Appellate Division of the District Court Department, which affirmed the judgment in Admiral's favor. Basement Technologies then filed this appeal.

Basement Technologies informed us in its brief that it had also settled its dispute with Silva and that, in so doing, "it acknowledged that there was sufficient evidence that the accidental spill was caused by its negligence." We have not been informed of the specifics concerning Basement Technologies' settlements with Clean Harbors and Silva.

2. *The policy.* The commercial general liability policy issued to Basement Technologies by Admiral provides, under Section I, coverage A, in subsection 1a, in relevant part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The policy also contains various pollution exclusions, set out in subsection 2f. Significant for our purposes is the following exclusion in subsection 2f:

"(2) Any loss, cost or expense arising out of any:

"(a) Request, demand, order or statutory or regulatory

requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, 'pollutants'; or

"(b) Claim or 'suit' by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, 'pollutants'.

"However, this paragraph does not apply to liability for damages because of 'property damage' that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or 'suit' by or on behalf of a governmental authority."[2]

Property damage is defined in the policy, in relevant part, as: "Physical injury to tangible property, including all resulting loss of use of that property." We note that damages on account of damage to property caused by the discharge of pollutants is considered property damage under the policy definition, subject to the application of other provisions in the policy. See *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 701 (1990). And a spill of home heating oil is considered a pollutant under the policy. See *McGregor* v. *Allamerica Ins. Co.*, 449 Mass. 400, 403 (2007). With that, we turn to the question of coverage.

3. *Coverage for property damage.* It is undisputed, for purposes of summary judgment, that absent the requirement to respond to the oil spill imposed by G. L. c. 21E, Basement Technologies still would be liable in negligence to the property owner for damage caused by the oil spill. See *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865, 870 (1993) (common-law liability is not dependent on either actual or potential liability under c. 21E).[3] The pollution exclusion in the policy exempts from coverage any loss, cost, or expense arising

---

[2]Hereinafter we will refer to subparts (2)(a) and (b) of subsection 2f as the pollution exclusion for statutory response costs, and will refer to the final sentence of subpart (2) as the exception to the pollution exclusion for statutory response costs.

[3]There is no basis to Admiral's argument that G. L. c. 21E somehow preempts

75 Mass. App. Ct. 709 (2009)                                     713

Clean Harbors Environmental Services, Inc. *v.* Boston Basement Technologies, Inc.

out of, among other things, a statutory requirement to clean up or otherwise respond to the effects of the oil spill. See, e.g., *Feinberg* v. *Commercial Union Ins. Co.*, 54 Mass. App. Ct. 587, 593 (2002). But the exception to the pollution exclusion for statutory response costs provides coverage for liability pursuant to common law for property damage caused by the oil spill.[4]

The issue before us is whether coverage for common-law property damage caused by the oil spill, pursuant to the exception to the pollution exclusion for statutory response costs, extends to the cost of Clean Harbors' services. Admiral maintains that the exception to the pollution exclusion must be interpreted to mean that any costs associated with removing the spilled oil and contaminated soil are not covered, because those costs are part and parcel of the response actions imposed upon Basement Technologies pursuant to G. L. c. 21E. Basement Technologies argues that the exception covers whatever damages are recoverable against it at common law, including cleanup costs to restore the property to its precontamination value.[5] There appear to be no cases interpreting these particular provisions.[6]

Admiral concedes, however, that diminution in the value of

common-law recovery for costs of restoration for damage to property caused by the oil spill. "[N]othing in G. L. c. 21E implies that the statute, the purpose of which is to provide a means 'to compel the prompt and efficient cleanup of hazardous material' by imposing strict liability on designated parties, preempts any common law remedies." *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. at 870.

[4]We note that in addition to a claim for common-law negligence, an injured property owner may seek recovery under G. L. c. 21E, § 5, for damages to property caused by environmental contamination. "The measure of recovery under G. L. c. 21E, § 5(*a*)(iii), is identical to [that] . . . at common law for damage to real or personal property." *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 333 (1993). We deal here with liability pursuant to a claim for common-law negligence.

[5]For ease of reference, we will refer generally to expenses imposed pursuant to environmental statutes as statutory response costs, and to expenses imposed pursuant to common-law recovery as restoration costs.

[6]Two cases upon which Admiral relies do not assist us. *Mid-Continental Cas. Co.* v. *Third Coast Packaging Co.*, 342 F. Supp. 2d 626 (S.D. Tex. 2004), involved a policy with a similar pollution exclusion and exception, but failed to address the exception or its meaning. Admiral also cites *Hussey Copper, Ltd.* v. *Royal Ins. Co. of America*, 567 F. Supp. 2d 774, 782 (W.D. Pa. 2008), wherein the magistrate judge, noting the lack of cases on point, relied on the Appellate Division decision in this case to construe a similar pollution exclusion and exception in the insurer's favor.

Silva's property as a result of the oil spill would be a covered loss, under the exception for common-law damages to the pollution exclusion for statutory response costs. We agree, noting that, even with respect to a policy containing a somewhat similar pollution exclusion for statutory response costs but no exception for common-law damages, the judge in *Utica Mut. Ins. Co. v. Hall Equip., Inc*, 73 F. Supp. 2d 83, 87-89 (D. Mass. 1999), aff'd sub nom. *Utica Mut. Ins. Co. v. Weathermark Invs., Inc.*, 292 F.3d 77 (1st Cir. 2002), ruled that diminution in property value was a covered loss, being separate and distinct from environmental response costs to assess, contain, and remove the pollutants.

Accordingly, we start from the premise that diminution in property value resulting from the oil spill on Silva's property is a covered loss under the exception to the pollution exclusion for statutory cleanup costs. At common law, diminution of value is generally viewed as the proper measure of damages for permanent injury to property. *Guaranty-First Trust Co. v. Textron, Inc.*, 416 Mass. 332, 336 (1993). *Black v. Coastal Oil New England, Inc.*, 45 Mass. App. Ct. 461, 465 (1998).

But diminution in value is not the sole measure of damages for harm negligently caused to property. "At common law, the measure of damages to real property is dependent upon whether 'the injury is permanent' or 'reasonably curable by repairs.' " *Black v. Coastal Oil New England, Inc.*, 45 Mass. App. Ct. at 465, quoting from *Belkus v. Brockton*, 282 Mass. 285, 287-288 (1933). "When the injury is temporary, that is, 'reasonably curable by repairs, the expense of repairs, if less than the diminished market value, is the measure of recovery.' " *Black v. Coastal Oil New England, Inc.*, *supra*, quoting from *Belkus v. Brockton*, 282 Mass. at 288. "The cost of repairs is the outlay necessary to restore property to its preinjury condition; in undertaking a repair, the injured party substitutes one measure of damages, a cash outlay, for another measure, the diminution in the property's value occasioned by the injury." *Commonwealth v. Johnson Insulation*, 425 Mass. 650, 666 (1997). See *Trinity Church v. John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 48-49 (1987); *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 672-675 (1st Cir. 1980), cert. denied, 450 U.S. 912 (1981);

Restatement (Second) of Torts § 929(1)(a) (1979) (damages for harm to land include compensation for the difference in value before and after the harm or the reasonable cost of restoration).

In cases involving common-law recovery for damage caused to property by pollution, this court has observed that the cost of restoring the property may be the more appropriate measure of damages, "since remediation essentially results in the restoration of the property to its predamage value." *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. at 466. When property has been damaged by the release of oil, a test of reasonableness is applied to determine whether diminution in market value or restoration is the appropriate measure of tort damages. *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. at 868. See *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. at 465 & n.10 (damages for permanent injury more appropriate recovery when cost of restoration exceeds the market value of the property before contamination); *Commonwealth of Puerto Rico* v. *SS Zoe Colocotroni*, 628 F.2d at 672-673 ("Where the property can be restored to its original condition for a sum less than the diminution in value, however, the cost of restoration may be substituted as a measure of damages").

Because either form of damages may be recovered at common law by the owner of contaminated property, depending on the nature of the harm and feasibility of restoration, we consider whether the policy language itself limits covered losses to diminution in value, as Admiral contends. Our reading of the policy's pollution exclusion for statutory response costs, together with the exception that immediately follows, shows no indication that restoration costs, if a more reasonable measure of damages than diminution in value, are not covered. The exception provides that the pollution exclusion for statutory response costs "does not apply" to the insured's liability for property damage that the insured would have "in the absence of such . . . statutory requirement." Giving "absence" its usual and ordinary meaning, the exception must be read to provide coverage for damages for which the insured would be liable if the statutory requirement imposing response obligations was not present or did not exist.[7] See

---

[7]Webster's Third New Int'l Dictionary 6 (2002) defines "absence," in relevant part, as the "state of being absent or missing from a place." "Absent" is defined, in relevant part, as "not present" or "not existing in a place." *Ibid.*

716                 75 Mass. App. Ct. 709 (2009)

Clean Harbors Environmental Services, Inc. *v.* Boston Basement Technologies, Inc.

*McGregor* v. *Allamerica Ins. Co.*, 449 Mass. at 402 (when interpreting an insurance policy, unambiguous terms are construed in their usual and ordinary sense). Contrary to Admiral's position, the exception does not carve out coverage only for property damage apart from, other than, or "independent of" response costs incurred pursuant to statutory requirements.

Admiral relies on *Utica Mut. Ins. Co.* v. *Hall Equip., Inc.*, 73 F. Supp. 2d at 89. As noted earlier, that case, unlike the case now before us, involved a policy with no exception to a pollution exclusion for environmental response costs. Based on the pollution exclusion in Utica's policy for costs "in any way responding to" the effects of pollutants, *id.* at 88, the judge ruled that coverage was excluded for those costs incurred directly in responding to the oil spill, including costs to clean up and remove the oil — what he characterized as remediation damages. He contrasted those damages with diminution in property value and lost rental income, which, though related to the oil spill, he characterized as nonremediation damages, because they were "separate and distinct from the costs of assessing, containing and removing the contamination." *Id.* at 87. As such, they were not excluded from coverage under the pollution exclusion.

Here, while we deal similarly with a pollution exclusion for environmental response costs, it is with the notable addition of the exception providing that the exclusion "does not apply" to damages for property damage for which the insured would be liable at common law. The exception, in our view, eliminates any remediation versus nonremediation distinction in delineating coverage of the insured's liability for common-law property damage. Instead, the plain language of the exception, directly on the heels of the pollution exclusion, indicates that what matters in determining coverage under this policy is the distinction between response actions imposed pursuant to environmental statutes and remedies imposed at common law to redress a property owner's loss.

The distinction makes sense when we consider the differences in the insured's liability and, hence, the insurer's ability to assess risk when issuing a liability policy. General Laws c. 21E, for example, generally identifies responsible parties without regard to common-law standards of duty of care and

causation and imposes liability for environmental contamination without regard to fault. Moreover, the statutory response costs imposed on the insured, unlike damages under common-law principles of recovery, can far exceed the diminution in the value of the property contaminated. See *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. at 701; *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. at 466 n.11. This derives from a primary concern of the Federal and State environmental statutes, which is to protect public health and natural resources and to provide for broad response and reimbursement to that end. See *Dedham Water Co.* v. *Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir. 1989) (describing the Comprehensive Environmental Response, Compensation, and Liability Act [CERCLA], 42 U.S.C. §§ 9601 et seq. [2006]); *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 223 (2002); *Bank* v. *Thermo Elemental Inc.*, 451 Mass. 638, 653 (2008) (regulations promulgated under G. L. c. 21E are to provide for the protection of "health, safety, public welfare and the environment").

Because the legislative aim is to protect the environment rather than simply to redress lost property value for an individual property owner, costs to a responsible party may far surpass the diminution in value of the damaged property and may extend far beyond the cost of remediating a single piece of property. *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. at 701 (environmental statute may impose cleanup costs that exceed common-law damages, and the government may seek recovery for damage to natural resources as well as to property).[8] Indeed, property that may have little or no commercial or market

---

[8]The potential to incur liability for losses, costs, and expenses pursuant to statutory requirements that exceed common-law recovery is evident from the requirements of CERCLA as well as of G. L. c. 21E. In Massachusetts, response actions must comply with extensive regulations promulgated to implement c. 21E, known as the Massachusetts Contingency Plan (MCP), 310 Code Mass. Regs. §§ 40.0001 et seq., "including substantive standards, deadlines and procedural requirements." *Mystic Landing, LLC* v. *Pharmacia Corp.*, 443 F. Supp. 2d 97, 104 (D. Mass. 2006). See *Bank* v. *Thermo Elemental Inc.*, 451 Mass. at 653. A responsible party is subject to the MCP's assessment and re-mediation process. *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. at 223-224 (detailing preliminary response actions and comprehensive site assessments required in five-phase regulatory process). In addition to the cost of immediate cleanup, statutory response costs can include costs for future assessment,

value nevertheless may require extensive restoration and rehabilitation costs to recover its ecological value, measures to be determined and monitored by regulatory agencies and the courts. See *Commonwealth of Puerto Rico* v. *SS Zoe Colocotroni*, 628 F.2d at 674 ("we think that limitation of recovery to those damages recoverable under the common law 'diminution in value' rule would be inconsistent with the manifest intent of Puerto Rico's environmental statute"). See also *Dedham Water Co.* v. *Cumberland Farms Dairy, Inc.*, 889 F.2d at 1156 (water company sought $19 million, under CERCLA, to restore drinking water wells allegedly contaminated by defendant's nearby truck maintenance facility); *American Cyanamid Co.* v. *Capuano*, 381 F.3d 6, 9-11, 26 (1st Cir. 2004) (judge estimated damages of over $50 million for groundwater and soil cleanup, pursuant to CERCLA, caused by hazardous wastes deposited at a pig farm).

In contrast, when recovery for contaminated property is based on negligence principles, the focus at common law is on liability for damage to the property itself. Unlike statutory response costs, at common law the affected property's value is generally determinative in measuring damages, whether through costs of restoration or compensation for permanent lost value. See *Guaranty-First Trust Co.* v. *Textron, Inc.* 416 Mass. at 338 ("while at common law the expense of repairs for a curable injury is only recoverable if less than the diminished market value of the damaged property, *Belkus*[ v. *Brockton*, 282 Mass.] at 288, [G. L. c. 21E, § 4,] places no such limit on the recovery of response costs"); *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. Ct. at 466 n.11. Thus, where the insured's negligence causes harm to the property of a third party, the limit on damages based on the diminution in value of the property affords insurers some measure of predictability in assessing the character of the risk and, accordingly, in setting premiums. See generally *Employers'*

containment, and removal. See *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. at 464; *Mystic Landing, LLC* v. *Pharmacia Corp.*, 443 F. Supp. 2d at 103. Costs and expenses under c. 21E can also include attorney's fees for managing a response action, *Bank* v. *Thermo Elemental Inc.* 451 Mass. at 659-660, as well as for enforcing claims for reimbursement against liable parties. See, e.g., *Commonwealth* v. *Boston Edison Co.*, 444 Mass. 324, 330-331 & n.8 (2005); *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. at 467; *Buddy's Inc.* v. *Saugus*, 62 Mass. App. Ct. 256, 259 (2004).

*Liab. Assur. Corp. Ltd.* v. *Vella*, 366 Mass. 651, 655 (1975) (materiality of factors that would "influence the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium"); *W.R. Grace & Co.* v. *Hartford Acc. & Indem. Co.*, 407 Mass. 572, 576 (1990) (insurers denied coverage, claiming that W.R. Grace & Co. knew of asbestos-related risks but failed to inform insurers during negotiations for coverage); *Hanover Ins. Co.* v. *Leeds*, 42 Mass. App. Ct. 54, 60 (1997) (material information "influenced the calculation of the rate of insurance premium based upon an increased risk of loss to the insurer").

Based on the foregoing considerations, we discern no rationale, either in the policy language itself or in our cases, for excluding common-law restoration costs from coverage when their recovery is a more appropriate remedy than recovery for diminution in property value. As explained above, either remedy may be available to the property owner against a party liable in negligence for property damage caused by pollutants, depending on the nature of the harm and the feasibility of restoration in relation to the property's value. The exception to the pollution exclusion for statutory response costs extends coverage to those remedies available at common law, limited, as such, by diminution in the value of the property, but not limited as to which form they may take.

Accordingly, we interpret the exception to the pollution exclusion for statutory response costs as acknowledging that the insured's statutory obligations to assess, contain, and remove the pollutants from the property may overlap, to some extent, with the insured's liability for common-law damages for the cost of restoring the damaged property to its precontamination value. As we read the interplay, exclusion of the former does not affect coverage of the latter. Our view comports with the plain language of the policy and with the recovery available at common law for property damage caused by pollutants, as developed through our cases.[9]

---

[9]We think the language of the exception, immediately following the pollution exclusion for statutory response costs and viewed in that context, is straightforward in exempting common-law damages from the exclusion. However, "[i]f there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. at 700.

Because questions of fact remain, however, our interpretation of the relevant policy provisions does not permit resolution, as a matter of law, of the coverage dispute regarding Clean Harbors' services. The property owner's counterclaim against Basement Technologies sought "damages, costs and expenses associated with the clean up of the oil spill." Recovery of damages at common law for both restoration costs and diminution in value generally would be duplicative, and were that the case, Admiral's duty to indemnify would not extend to both. See generally *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. at 870-871; *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. at 466. On the other hand, Basement Technologies' prompt action in hiring Clean Harbors may have reduced the harm to the property and, consequently, Basement Technologies' liability for its diminution. Our cases recognize that curative measures that reduce damage to property are not necessarily duplicative of diminution damages, and the cost of such measures also may be recoverable in the appropriate circumstances. See *Bousquet* v. *Commonwealth*, 374 Mass. 824, 825 (1978); *Gendreau* v. *C.K. Smith & Co.*, 22 Mass. App. Ct. 989, 990-991 (1986).[10]

As the record before us reveals little about Basement Technologies' settlements with Silva and Clean Harbors, it is for the finder of fact to determine whether Admiral's indemnification for Clean Harbors' services would be duplicative of amounts paid to the property owner in damages for diminution in value. Coverage also depends on the portion of Clean Harbors' services that constituted appropriate and reasonable restoration costs under principles of common-law recovery. Tasks performed solely to meet statutory requirements, over and above what was necessary for common-law property restoration, are not covered under the exception to the pollution exclusion in Admiral's policy. Only those costs for which Basement Technologies is liable at common law, in the absence of the statutory requirement to respond to the oil spill, are covered under the policy, and it is those costs that

---

[10]We reject Admiral's argument in its surreply brief that because the dispute between Clean Harbors and Basement Technologies is based on contract, its payment does not implicate the policy. The fact that Basement Technologies hired Clean Harbors to restore the property does not affect coverage of the cost under the policy as a component of the insured's liability for property damages.

should be ascertained by the finder of fact. See generally *Commonwealth* v. *Boston Edison Co.*, 444 Mass. 324, 338 n.14 (2005) (distinguishing response costs from construction-related costs at construction site was a question of fact for the jury). And finally, because Basement Technologies settled with Clean Harbors, a determination should be made of the amount, if any, that Admiral must pay to indemnify Basement Technologies for that settlement. See, e.g., *Dilbert* v. *Hanover Ins. Co.*, 63 Mass. App. Ct. 327, 336 (2005).

4. *Conclusion.* Admiral's policy covered Basement Technologies' liability in negligence for damage it caused to Silva's property, including restoration costs where such costs constituted an alternative to, or reduction in, damages for diminution in value. Questions of fact as to the damages recovered by the property owner (Silva) and to what extent, if any, Clean Harbors' services were a component of those damages, prohibit our determination of the amount to be paid under Admiral's policy. Accordingly, the judgment is reversed, and the matter is remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*