STANTON L. BLACK & others[1] vs. COASTAL OIL NEW
ENGLAND, INC.

No. 96-P-1215.

Suffolk. January 20, 1998. - September 16, 1998.

Present: BROWN, JACOBS, & SPINA, JJ.

*Hazardous Materials. Massachusetts Oil and Hazardous Material Release Prevention Act. Real Property,* Environmental damage. *Damages,* Hazardous waste contamination, Future damages. *Practice, Civil,* Attorney's fees, Costs.

In an action brought in 1990 under G. L. c. 21E, §§ 4 and 5, as inserted by St. 1983, c. 7, § 5, in which the evidence supported the judge's conclusion that the hazardous material contamination at the site in question was reasonably curable, the appropriate measure of damages was not diminution in value of the property (appropriate to permanent or irremediable injury) but rather consequential damages, if any, under § 5 and reimbursement of incurred cleanup costs under § 4, as in effect at that time. [464-466]

In an action under G. L. c. 21E, §§ 4 and 5, the Massachusetts Oil and Hazardous Material Release Prevention Act, the plaintiffs, who failed to establish a compensable loss under § 5, were nevertheless entitled to recover, under G. L. c. 21E, § 15, all costs and attorney's fees related to their successful claim under § 4. [467-468]

CIVIL ACTION commenced in the Superior Court Department on May 23, 1990.

The case was heard by *Walter E. Steele,* J.

*Robert W. Thuotte (Daniel J. Dwyer* with him) for the defendant.

*David A. Guberman (A. Neil Hartzell* with him) for the plaintiffs.

JACOBS, J. The plaintiffs have been owners, since 1983, of

[1]Barry S. Stone, Arthur J. Epstein, Morton E. Ruderman, and Neil A. Cooper. All plaintiffs are named as general partners of Suffolk Square Associates III Limited Partnership.

industrial property in Malden (the site). In 1990,[2] they filed a complaint in the Superior Court seeking damages from the defendant pursuant to G. L. c. 21E, the Massachusetts Oil and Hazardous Material Release Prevention Act, for contamination of the site. The contamination occurred between 1929 and 1975 during the operation of a fuel storage and distribution business by a company whose liabilities were ultimately assumed by the defendant in the course of a corporate merger. Following a jury-waived trial, judgment was entered awarding the plaintiffs $13,320.39 for response costs under G. L. c. 21E, § 4, $2,190,000 for damages to their realty under G. L. c. 21E, § 5, and $246,035.48 in fees and costs under G. L. c. 21E, § 15. We affirm in part and reverse in part.

It is undisputed that the defendant is responsible for the "release" at the "site" of "oil" and "hazardous material" as those terms are defined in c. 21E, § 2, and that the plaintiffs are innocent of any such responsibility. Also, the defendant does not contest the damages awarded under G. L. c. 21E, § 4, for response costs properly incurred and expended by the plaintiffs.[3] Only the awards under G. L. c. 21E, §§ 5 and 15, are at issue.[4]

1. *Section 5 damages.* General Laws c. 21E, § 5(a)(5)(iii), as inserted by St. 1983, c. 7, § 5 (§ 5), establishes private party liability "for damage to . . . real or personal property incurred or suffered as a result of [a] release [of oil or hazardous material] or threat of [such] release." Before trial, the judge denied the defendant's motion to bar any reliance by the plaintiffs on claimed, but not incurred, future costs of cleaning up the site. The defendant argued in the motion that as a "matter of law, the plaintiffs may not recover under Chapter 21E for any of their claimed future costs." At trial, the judge credited the testimony of the plaintiffs' expert witnesses, which he summarized in the following findings of fact:

[2]The complaint was filed on May 23, 1990, and the case was tried on the basis of G. L. c. 21E, §§ 4 and 5, as inserted by St. 1983, c. 7, § 5.

[3]The judge found that the plaintiffs incurred $37,067.45 in engineering and laboratory fees but failed to comply with provisions of the Massachusetts Contingency Plan governing preliminary assessments, which went into effect on October 3, 1988. See 310 Code Mass. Regs. § 40 (1988). Accordingly, he limited recovery under G. L. c. 21E, § 4, to costs of $13,320.39 incurred prior to that date.

[4]The defendant also appeals from the denial of its motion for a new trial on grounds of posttrial regulatory changes. In view of our decision, there is no need to address these grounds.

"[T]he contamination at the site is reasonably curable, and can be remediated at a reasonable cost with reasonable certainty.

"The cost for . . . groundwater . . . remediation is approximately $160,000 . . . . The total estimated cost to clean up the 5,400 cubic yards of contaminated soil at the site is approximately $2,000,000. This figure includes excavation, stockpiling, loading into trucks and restoration . . . at approximately $65 per cubic yard; the transportation of the contaminated soil at approximately $150 per cubic yard; and disposal . . . at approximately $50 per cubic yard.[5] The total cost estimate also includes an amount for contingencies and also an engineering charge. . . . Additional testing is needed . . . [at an] approximate cost . . . of $30,000. Thus, the total cost of remediating the site . . . equals $2,190,000.

"The site property is income producing real estate with an annual income of approximately $300,000 under a triple net lease, in which the tenant pays all operating costs . . . . The current tenant . . . is pleased with the . . . building . . . and plans to remain on a long-term basis at no less than the current lease.[6]

"Capitalizing the $300,000 annual rental income at the nine percent capitalization rate, the value of the site property . . . if it were free and clear of contamination is $3,300,000.

"Properties with contamination would be sold well below their fair market value.

---

[5]The expert witness who testified as to cleanup costs stated that disposal costs would be approximately $150 per cubic yard. A finding requested by the plaintiffs listed disposal at $50 per cubic yard.

[6]The site includes a building with approximately 43,200 square feet of warehouse space and 2,250 square feet of office space. It is leased to a manufacturing enterprise. One of the plaintiffs' witnesses testified that the tenant was "very pleased with the occupancy," and that the lease "was extended in 1988 through June 30th of 1993. The extension also has an option allowing the tenant to extend for another five year period." The lease and notice of lease in evidence indicate that the lessee has "two successive options to renew the Lease, for three years and four years, respectively. . . ." The lease provides for an adjustment of rent during the extended terms based upon current market rent calculated by comparison with similar premises.

"Plaintiffs have suffered a diminution in the value of the site equal to the cost of cleaning the property of all contamination, leaving the property worth only $1,140,000.

"The expenditure of $2,190,000 for remediation will completely restore the site to its full market value in an uncontaminated state.

"Remediation of the site is a fair and reasonable valuation of damages, because the cost of cleaning up the property is not disproportionate to the fair market value of the property if it were free and clear of contamination."

In his conclusions of law, the judge, relying on *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332 (1993) (*Guaranty*), ruled that § 5 of c. 21E "allows an injured property owner to bring suit regardless of whether costs have already been incurred." *Id.* at 338. He stated, quoting from *Guaranty, supra* at 333, that "[t]he measure of recovery under G. L. c. 21E, § 5(a)(iii), is identical [to that] . . . at common law for damage to real or personal property." Relying further on *Guaranty, supra,* he determined that measure to be "diminution in market value" and concluded, purportedly relying on *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865 (1993) (*Mailman's*), that "[t]he cost to clean up the site is a proper measure for valuing the diminution in market value."

We agree with the defendant's contention that it was error to award § 5 damages based solely on future cleanup costs. Unassisted by the statute, which is silent with respect to the measure of damages, the judge adopted an application of § 5 that fails in several respects. It ignores the observation in *Mailman's, supra* at 873-874, later reinforced in *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 299 (1997), that a "person liable for cleanup under § 5 can sue other liable parties under § 4 for reimbursement of cleanup costs already paid, but cannot sue under § 5(a)(5)(iii) to recover costs not yet incurred."[7] Cleanup or "response" costs include costs of assessment, containment, and removal. See G. L. c. 21E, § 2. Prior payment is a

---

[7]At the time of trial, G. L. c. 21E, § 4, added by St. 1983, c. 7, § 5, provided in pertinent part that a "person who undertakes assessment, containment or removal action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such assessment, containment and removal."

prerequisite for reimbursement. *Oliveira* v. *Pereira*, 414 Mass. 66, 73-74 (1992). Only after the addition of G. L. c. 21E, § 4A, see St. 1992, c. 133, § 294, has a private party who is liable under § 5 been able to seek contribution toward future response costs before commencing cleanup and then only after complying with comprehensive notice and dispute resolution procedures. "Prior to the addition of this section, a private party was limited to bringing an action for reimbursement of cleanup costs under § 4." *Mailman's, supra* at 874 n.8.[8]

The plaintiffs argue that they did not seek future cleanup costs in their § 5 claim and that the judge merely utilized those costs in measuring property damage under that section. The difficulty with that argument is that the judge, in applying those costs, erroneously conflated inapposite common law concepts in arriving at his decision.

Because § 5 is silent as to how to measure the damages for the private right of action created by it, we look to the common law for guidance.[9] *Guaranty, supra* at 336. At common law, the measure of damages to real property is dependent upon whether "the injury is permanent" or "reasonably curable by repairs." *Belkus* v. *Brockton*, 282 Mass. 285, 287-288 (1933). See *Guaranty, supra* at 336-337.[10] When the injury is permanent, the appropriate measure of damages is diminution of value determined by "the difference in the fair market value of the injured premises before and after the injury." *Belkus* v. *Brockton, supra*. When the injury is temporary, that is, "reasonably curable by repairs, the expense of repairs, if less than the diminished market value, is the measure of recovery." *Id.* at 288. See *Guaranty, supra* at 337. Accordingly, diminution in

---

[8]See Porter, Amendments to 21E Impose New Prerequisites to Suit, Mass. Law. Wkly., Dec. 20, 1993. See also Anderson & Mason, Recent Developments in Cost Recovery Actions, in Finding the $ in Chapter 21E 245, 245 (Mass. Continuing Legal Educ. 1997).

[9]The analogous Federal statute, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), "does not provide a cause of action to recover damages in the value of the property." *One Wheeler Rd. Assocs.* v. *Foxboro Co.*, 843 F. Supp. 792, 795 (D. Mass. 1994).

[10]Aside from indicating that damage is permanent if "unchanged by a cessation of the injurious action," *Belkus* v. *Brockton, supra* at 288, our courts have not expressly defined the concept of permanent damage to realty. Other courts have characterized a permanent injury as one that is presumed to continue indefinitely. 22 Am. Jur. 2d Damages § 406, at 491 (2d ed. 1988). "Another view is that permanent injury results when the cost of restoration exceeds the market value of the property prior to the injury." *Ibid.*

value analysis generally[11] has no place in assessing the cost of remediation for temporary injury.[12] As we have indicated, to the extent that the expense of cleanup was recoverable at the time of this action, that recovery could be pursued only under § 4.

The rationale for the distinction between temporary and permanent injury has particular validity in contamination cases, since remediation essentially results in the restoration of the property to its predamage value. *Mailman's, supra* at 871. See Cox & Bachrach, Damages for Contaminated Property, 37 Boston Bar J. 19 (July/August 1993). The distinction, both theoretically and under our interpretation of G. L. c. 21E, §§ 4 and 5, guards against the possibility of duplicative damages, a result traditionally resisted in our law. See *Crowley* v. *J.C. Ryan Constr., Inc.*, 356 Mass. 31, 36 (1969). Here, the evidence amply supports the judge's finding that "the contamination at the site is reasonably curable, and can be remediated at a reasonable cost with reasonable certainty." Given this determination, his venture into diminution of value analysis is inappropriate with respect to a private party claim under § 5. Our interpretation reserves to § 5 not only actions for permanent injury but also actions for the incidents of cleanup such as related restoration and repair work and lost rental value suffered during the cleanup and repair period. *Guaranty, supra* at 338-339. No evidence of such consequential damage was offered by the plaintiffs.

Even if we put aside the judge's determination that the contamination is reasonably curable, and treat his use of diminu-

---

[11]We recognize that under the general common law rule, diminished market value serves to establish the limit of "the expense of repairs" as the measure of recovery for temporary damage to real estate. *Belkus* v. *Brockton, supra* at 288. As we have indicated, *Mailman's, supra,* limits the recoverable response expenses under G. L. c. 21E, §§ 4 and 5, to incurred costs. Under G. L. c. 21E, § 4, recovery of such costs is not limited by the value of the damaged property. *Guaranty, supra* at 338.

[12]Compare *Bousquet* v. *Commonwealth,* 374 Mass. 824 (1978), and *Gendreau* v. *C.K. Smith & Co.,* 22 Mass. App. Ct. 989 (1986). In Cox & Bachrach, Damages for Contaminated Property, 37 Boston Bar J. 19 (July/August 1993), the authors correctly distinguish these cases to the extent they might be read to indicate that an owner of contaminated property ordinarily can recover both diminution in value and costs of remediation, by pointing out that such remedy may be limited to cases where response costs are incurred in an unsuccessful attempt to fully remedy the injury. See *Bisson* v. *Eck,* 40 Mass. App. Ct. 942 (1996) (affirming an award of both cleanup costs and "stigma" damages to property under the doctrine of the law of the case where defendant did not contest the duality of damages).

tion of value analysis as implicitly reflecting a finding that the injury to the site is permanent, the method under which he assessed damages nevertheless is erroneous. By definition, the measure of damages for permanent injury precludes evidence of the future cost of remediation of that injury. That error was compounded by the findings that anomalously adopted an income capitalization method of valuing the site, as if "free and clear of contamination," which utilized a rental income stream without taking into account whether the rental value, see note 5, *infra*, as reflected by that income stream, may have been affected by knowledge of the contamination.

2. *Attorney's fees and costs.* Section 15 of c. 21E, as inserted by St. 1986, c. 554, § 3, provides in pertinent part: "In any suit . . . to enforce the requirements of [c. 21E], . . . the court may award costs, including reasonable attorney and expert witness fees, to any party . . . who advances the purposes of this chapter." Those purposes, aside from improving "the Commonwealth's capability to respond to environmental contamination," *Guaranty, supra* at 335, are "to compel the prompt and efficient cleanup of hazardous material," *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 197 (1987), and to enable private persons "to obtain a certain measure of compensation for loss resulting from environmental damage." *Guaranty, supra* at 335. Given our decision that the plaintiffs have not established a compensable loss under § 5, the purposes of that section were not advanced by the plaintiffs' complaint. Notwithstanding that the plaintiffs undertook assessment measures soon after they became aware of pollutants on the site in April of 1988, there is no indication in the record that any site cleanup had been undertaken at the time of trial in 1992, or even in 1994 when the parties filed requests for findings and rulings.[13] Moreover, the testimony of one of the plaintiffs' experts casts doubt over whether the Commonwealth was pursuing the cleanup of the site or had any plans to do so.

The ruling that the plaintiffs are entitled to G. L. c. 21E, § 4, response costs in the amount of $13,320.39 raises a different is-

[13]The judge's decision was filed in October, 1995. There is no explanation in the docket for the hiatus between the trial and the filing of requests for findings and the decision. The affidavit filed in support of the plaintiffs' request for an award of fees and costs indicates that approximately forty-three percent of the claimed legal fees were incurred for the "post trial phase" of the case, which included "attending several status conferences."

sue with respect to costs and attorney fees. Although the plaintiffs' recovery of § 4 fees and costs properly was limited, see note 3, *supra*, their efforts at assessing the extent of the contamination of the site were, nevertheless, within the statutory remediation scheme of c. 21E. We therefore conclude "that any person who undertakes assessment . . . activities as defined in [c. 21E], and subsequently seeks reimbursement pursuant to G. L. c. 21E, § 4, enforces and advances the purposes of [that chapter]." *Sanitoy, Inc.* v. *Ilco Unican Corp.*, 413 Mass. 627, 632 (1992). Accordingly, the plaintiffs are entitled to recover, pursuant to § 15, all costs and attorney fees related to their proof and recovery of § 4 response costs incurred by them. Because the record is not susceptible of separating the § 4 costs and fees from those incurred with respect to § 5, the matter of the plaintiffs' entitlement under § 15 must be resolved by the Superior Court.

The judgment is affirmed with respect to the $13,320.39 award for response costs under G. L. c. 21E, § 4, and reversed with respect to the award for damages to property under G. L. c. 21E, § 5(*a*)(5)(iii). Judgment shall enter for the defendant on the plaintiffs' claim for damages under § 5. That portion of the judgment awarding the plaintiffs fees and costs is vacated, and the case is remanded to the Superior Court for determination of fees and costs under G. L. c. 21E, § 15, consistent with this opinion. The order denying the defendant's motion for a new trial is affirmed. The plaintiffs' request for attorney's fees and other costs on appeal is denied.

*So ordered.*