NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12294

GRAND MANOR CONDOMINIUM ASSOCIATION & others[1] vs.
CITY OF LOWELL.

Middlesex.      October 5, 2017. - January 19, 2018.

Present: Gants, C.J., Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.

Hazardous Materials. Massachusetts Oil and Hazardous Material
    Release Prevention Act. Real Property, Environmental
    damage. Limitations, Statute of. Practice, Civil, Statute
    of limitations. Damages, Hazardous waste contamination.

Civil action commenced in the Superior Court Department on
October 10, 2012.

The case was tried before Kathe M. Tuttman, J.

_____

[1] Keith Parker; Paul Donoghue; Anthony Delgreco; Wilmer
Gallo Solorzano; Susanna Ritson; Carol Sagro; Judith Copithorne;
Frances Inglis; Susan Elimhingbe; Kathleen Harrison; Derek
Soderquist; Eiddie Katende; Walter Patterson, Jr.; Michael R.
Sherman; Michael Gibbs; Sakhoeurn Van; Ellsworth J. Evans, Jr.;
Paul Weissbach; Amir Tabrizi; Keith L. Bennett, Jr.; Prabhaker
Jani; Jyoti Jani; William R. Zink; Linda A. Zink; Daniel R.
Smith, Sr.; Ashwin Thakkar; Giselia Resendes; Michelle Maher;
Maureen Guerin-Porter; Theodore Leoutsakos; Susan Leoutsakos;
Lawrence Kelleher; Deborah Carkin; George Barry; Nancy Barry;
Brian Andriolo; Helen Bullock; Edward Bullock; Julia Paquin;
Tracy Paquette; and Dolores Lemieux.

The Supreme Judicial Court granted an application for direct appellate review.

Alan B. Rubenstein (Stacie A. Kosinski also present) for the plaintiff.
C. Michael Carlson, Assistant City Solicitor (Rachel M. Brown, Assistant City Solicitor, also present) for city of Lowell.

KAFKER, J.  The owners of condominium units at Grand Manor and the Grand Manor Condominium Association (collectively, plaintiffs) filed suit against the city of Lowell (city) on October 10, 2012, for the release of hazardous materials at the Grand Manor condominium site.  The plaintiffs brought claims for response costs under G. L. c. 21E, § 4A, and for damage to the plaintiffs' property under G. L. c. 21E, § 5 (a) (iii).[2]  A jury found that the plaintiffs' claim under § 5 (a) (iii) was barred by the applicable statute of limitations, G. L. c. 21E, § 11A (4).  The plaintiffs appealed, and we granted their application for direct appellate review.  On appeal, the plaintiffs argue that (1) the statute of limitations did not begin to run until the plaintiffs knew that the property damage was permanent; and (2) the trial judge erred in instructing the jury that the plaintiffs had the burden of persuasion to show that they filed suit within the statute of limitations.  The

---

[2] The plaintiffs brought a third claim under G. L. c. 93A, but the trial court granted summary judgment for the city on this claim and the plaintiffs do not appeal from that ruling.

city contends that the plaintiffs needed to know only that there was environmental damage and that the defendant was the source of the damage, not that the damage was permanent, for the limitations period to begin to run. The city also contends that the jury were properly instructed.

We conclude that a plaintiff must be on notice that he or she has a claim under § 5 (a) (iii) before that claim may be time barred, and that such notice is separate from a plaintiff's notice that environmental contamination has occurred. A plaintiff has notice of a claim under § 5 (a) (iii) once the plaintiff learns whether or not remediation and response costs will fully compensate the plaintiff for the harm he or she has suffered, as well as the identity of the party who caused such harm. This will not ordinarily occur until the plaintiff learns that the damage to his or her property is not reasonably curable by the remediation process. As we conclude as a matter of law that the plaintiffs could not know that they had a claim under § 5 before June 6, 2012, when the city filed its Phase II/Phase III report pursuant to the Massachusetts Contingency Plan, the statute of limitations issues should not have been presented to the jury. We therefore vacate the judgment below and remand this case for further proceedings consistent with this opinion.

1. Background. a. Overview of G. L. c. 21E. The Massachusetts Oil and Hazardous Material Release Prevention Act,

G. L. c. 21E, was enacted both "to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." Taygeta Corp. v. Varian Assocs., Inc., 436 Mass. 217, 223 (2002). The Department of Environmental Protection (department) has promulgated a set of regulations known collectively as the Massachusetts Contingency Plan (MCP) that detail specific requirements for complying with the G. L. c. 21E remediation process. See id., citing G. L. c. 21E, § 3, and 310 Code Mass. Regs. §§ 40.0000 (1999).

As we explained in Taygeta Corp., 436 Mass. at 224, once the department is notified of a release of hazardous materials, "a property owner or other responsible person is subject to a five-phase assessment and remediation process set forth in the MCP." That assessment and remediation process defines how much cleanup of the property will be required and who will be responsible for the cleanup. "Phase I consists of preliminary response actions and risk reduction measures, including a limited investigation and evaluation of the contaminated site and a remediation of sudden releases, imminent hazards, and other time-critical conditions. . . . Preliminary response actions may be sufficient for complete evaluation or remediation of localized or uncomplicated releases and threats of release at some sites. . . . Where that is not the case, the property

owner or other responsible person must proceed with the subsequent phases of the assessment and remediation process described in the MCP." (Citations omitted.) Id.

Phase II includes "a characterization of the sources, nature, and vertical and horizontal extent of contamination at the disposal site, and the identification and characterization of all potential human and environmental receptors that could be affected by hazardous material at or migrating from such site." Id. at 224-225. Phase III requires the "identification and selection of comprehensive remedial action alternatives." Id. at 225 n.12. Phase IV implements the selected remedial action alternative. Id. If needed, the property owner or other responsible person will proceed to Phase V for the continued "operation, maintenance, or monitoring of the disposal site." Id. See 310 Code Mass. Regs. § 40.0890 (2014).

A site does not need to be remediated to its pre-contamination state in order to complete the remediation process specified in the MCP. Rather, there are a number of means by which a party can finish the remediation process. See 310 Code Mass. Regs. § 40.1000 (2014). For example, a party may be able, or even required, to implement an Activity and Use Limitation (AUL) to reduce contaminants to levels that pose no significant risk to public health. See 310 Code Mass. Regs. § 40.1012

(2014).  An AUL limits the permissible range of future activities and acceptable uses for the site, in order to prevent a member of the public from being exposed to contamination that remains onsite that could not feasibly be remediated.  See id.  Thus, a site with an AUL is remediated to the point of no significant risk to public health, but may still contain hazardous materials.  As is the case when a site utilizes an AUL, the remediation process under G. L. c. 21E and the MCP do not necessarily cure all property damage that resulted from the contamination.

   b.  Facts.  In 1906, the city acquired the land upon which the Grand Manor condominium was later built.  In the early part of the Twentieth Century, the city operated the site as a quarry for mining rock and gravel.  During the 1940s and 1950s, the city used the site as a landfill.  Solid waste, such as tires, leather waste products, batteries, bottles, and containers of liquid were deposited in areas that had been excavated during the site's prior use as a quarry.  The landfill was eventually covered and sat unused until 1983, when the city conveyed the property to a real estate developer.  The developer constructed the Grand Manor condominium on the property, and recorded the master deed for it in 1985.[3]

_____

   [3] The developer who conveyed the land is now deceased.

In November, 2008, the Grand Manor Condominium Association (association) hired a contractor to excavate part of the site to install a drainage system.  During the excavation, the contractor discovered discolored soil, as well as debris including glass, bottles, metal, vehicle parts, and ash.  Two soil samples were collected from separate stockpiles of excavated soil and submitted for testing.  In a letter dated December 31, 2008, the contractor was informed that one of the two soil samples indicated that a release of hazardous materials had occurred.  The letter stated that the owner of the site was required to notify the department of the release and hire a licensed site professional to comply with its duties under G. L. c. 21E.[4]  See 310 Code Mass. Regs. §§ 40.0169, 40.0315.  The association learned of the soil test results in early 2009.  The site's prior use as a landfill was the source of the hazardous materials.[5]

---

[4] A licensed site professional is an individual licensed by the State to provide opinions on safely cleaning hazardous waste sites.  See G. L. c. 21A, § 19; 310 Code Mass. Regs. § 40.0006 (2014).

[5] The city of Lowell (city) did not concede that the landfill was the cause of the release prior to trial.  However, in a joint pretrial memorandum containing an agreed statement of facts, the parties stated that the "source of the hazardous materials discovered at the Grand Manor site and released into the environment is the former use of the site as a solid waste landfill."

In January, 2009, the association hired Joseph Jammallo as its licensed site professional.  In March, 2009, Jammallo attempted a limited removal action to remediate the contamination, which would allow the association to avoid the much lengthier five-phase cleanup process mandated by the MCP.[6] 310 Code Mass. Regs. § 40.0318 (2014).  Jammallo issued a report on April 24, 2009, informing the association that the limited removal action had failed.  The association notified its residents and unit owners of the contamination in a letter dated the same day.  Both the report and the letter indicated that members of the association had learned through personal research that the site was once operated as a landfill by the city.  The report stated that the contamination "may likely be associated with the wastes that were deposited on the [s]ite over the years of the [c]ity's ownership [and operation of the dump]," but recommended further investigation to assess the "nature and approximate extent of the release."  The letter similarly stated that "[t]he extent and nature of materials disposed of is not yet known."

_____

[6] A limited removal action consists of removing up to twenty cubic yards of contaminated soil from the site.  310 Code Mass. Regs. § 40.0318(4)(b) (2014).  Afterward, if the remaining concentrations of hazardous material in the soil are below the contamination levels that require notifying the Department of Environmental Protection (department), the limited removal action has been successful.  310 Code Mass. Regs. § 40.0318(9) (2014).

Four days later, the association notified the department of the release of hazardous materials, and requested that the department issue a notice of responsibility to the city.[7]  In May 2009, the department sent a notice to both the city and the association informing them that they were potentially responsible parties under G. L. c. 21E, § 5, and ordering them to undertake all response actions necessary to achieve a level of no significant risk to public safety, in compliance with the MCP.

On July 16, 2009, the city hired its own licensed site professional, Christopher McDermott, and Jammallo's work for the association ceased.[8]  On October 13, 2009, the association sent a letter to the city demanding reimbursement for costs the association incurred responding to the contamination, pursuant to G. L. c. 21E, § 4.  In April, 2010, McDermott filed a Phase I Initial Site Investigation report with the department.  The Phase I report stated that the release of hazardous materials "is likely related to the former use of the [s]ite as a solid waste landfill."  The report indicated that interpreting aerial

---

[7] The department sends notices of responsibility to parties that may be liable for the release of hazardous materials under G. L. c. 21E, § 5.  See 310 Code Mass. Regs. § 40.0160(1) (2014).

[8] Christopher McDermott was the city's licensed site professional until January, 2012.

photographs from 1957 "suggest[ed]" where the outer boundaries of the contamination were located.

On July 7, 2010, the city sent Grand Manor residents and unit owners a letter assuring them that it was working to "develop and implement a more permanent solution to protect" their health and safety.  However, the city noted that "significant additional testing and monitoring in multiple seasons (to determine if seasonal factors impact contamination levels, as is often the case) is required by the [department] to establish and implement a definitive long term remediation strategy."

In June, 2011, a subcontractor completed a geophysical report on the extent of the site contamination for the city. The report calculated that there were over 1.5 million cubic feet of hazardous material at the site, and that the hazardous material extended down to the bedrock.  The findings from this report were included in the city's Phase II Comprehensive Site Assessment, which was filed in June, 2012, along with the city's Phase III Remedial Action Plan.  The Phase II report stated that the source of the hazardous material was "fill containing soil and solid waste from the landfill disposal operations in the [city's former landfill] in the 1940s and 1950s."  The Phase III report indicated that returning the site to its original condition would cost approximately $11.7 million, and was not

feasible.  The report concluded that installing an asphalt or
concrete pavement cap over the hazardous material and
implementing an AUL would be the most practical remedy, and laid
out a tentative schedule for implementing that solution.

The plaintiffs filed suit on October 10, 2012, for response
costs, under G. L. c. 21E, § 4A, and damage to the plaintiffs'
property, under G. L. c. 21E, § 5 (a) (iii).  The statute of
limitations period for the claim under § 5 is three years.
G. L. c. 21E, § 11A.  Thus, the plaintiffs' claim under § 5
would only be timely if the limitations period began to run on
or after October 10, 2009.

The plaintiffs moved for summary judgment, arguing in
relevant part that a claim under § 5 (a) (iii) requires
permanent damage, and that the statute of limitations did not
begin to run until they learned the damage was permanent.  The
trial court rejected the latter argument.  Instead, the court
ruled that the city was a liable party as defined in G. L.
c. 21E, § 5 (a) (iii), but that there was a "genuine issue of
material fact as to which date commenced the running of the
three-year limitations period" for the claim under
§ 5 (a) (iii).  The court listed several potential dates that
could have triggered the limitations period:  (1) March, 2009,
the date Jammallo conducted the limited removal action; (2)
April 24, 2009, the date Jammallo issued a report indicating the

limited removal action had failed; (3) May 21, 2009, the date the department notified the city it was a potentially responsible party; or (4) October 13, 2009, the date the plaintiffs sent a letter to the city demanding reimbursement for response costs under § 4A.

At trial, the jury were instructed that the plaintiffs "must first persuade you by a fair preponderance of the evidence that their claim did not arise until on or after October 10, 2009." The jury awarded the plaintiffs response costs pursuant to G. L. c. 21E, § 4, but found that the plaintiffs had failed to prove that their claim under § 5 (a) (iii) was brought within the statute of limitations.[9]

2. Discussion. The statute of limitations for claims under § 5 (a) (iii) provides as follows:

> "Actions by persons other than the [C]ommonwealth to recover for damage to real or personal property shall be commenced within three years after the date that the person seeking recovery first suffers the damage or within three years after the date the person seeking recovery of such damage discovers or reasonably should have discovered that the person against whom the action is being brought is a person liable pursuant to this chapter for the release or threat of release that caused the damage, whichever is later."

G. L. c. 21E, § 11A (4). See Taygeta Corp., 436 Mass. at 226 (individual who brings claim under § 5 [a] [iii] must do so

---

[9] The city has not appealed from the judgment awarding response costs to the plaintiffs under § 4.

within three years of when plaintiff "discovers or reasonably should have discovered [1] the damage, and [2] the cause of the damage").[10]  The plaintiffs argue that the word "damage" in § 11A (4) refers specifically to damage under § 5 (a) (iii), which the plaintiffs contend is limited to damage not reasonably curable by repair.  Accordingly, they argue that the limitations period should not begin to run until a plaintiff discovers or reasonably should have discovered that the damage is not reasonably curable by repair.[11]  The city disagrees, arguing that

---

[10] By contrast, claims for response costs pursuant to G. L. c. 21E, § 4 or 4A, have a statute of limitations that provides:

> "Actions brought by persons other than the [C]ommonwealth pursuant to [§§ 4 or 4A] to recover reimbursement, contribution or equitable share shall be commenced within three years after the date the person seeking such recovery discovers or reasonably should have discovered that the person against whom the action is being brought is a person liable pursuant to the provisions of this chapter for the release or threat of release for which such costs or liability were incurred, or within three years of the time when the person bringing the action first learns of a material violation of an agreement entered into pursuant to [§ 4A], or within three years after the person bringing the action incurs all response costs, or within three years after payment by the person seeking contribution, reimbursement, or an equitable share for liability pursuant to the provisions of this chapter, or within three years after sending notice pursuant to the [§ 4A, first par.], whichever is later."

G. L. c. 21E, § 11A (2).

[11] The plaintiffs rely on this court's holding in Hill v. Metropolitan Dist. Comm'n, 439 Mass. 266 (2003), for their contention that damages under § 5 (a) (iii) are those that are not reasonably curable by repair.  In Hill, the trial court

notice of environmental contamination and the identity of the responsible party is sufficient to trigger the limitations period.

We must consider the statute of limitations for claims under § 5 (a) (iii) "in the context of the over-all statutory scheme and the regulations set forth in the MCP." Taygeta Corp., 436 Mass. at 226. As we have explained, "G. L. c. 21E was drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." Id. at 223. Its statutory and regulatory scheme sets out separate phases of assessment and remediation, which eventually lead to a decision about the appropriate level of remediation, beyond which further cleanup would be cost prohibitive. See 310 Code Mass. Regs. § 40.0860 (2014). More specifically, in Phase III of this process, the responsible parties determine whether the contamination can be feasibly remediated to precontamination levels, and select a feasible remediation plan. See 310 Code Mass. Regs. § 40.0852 (2014). Recognizing the different phases of assessment and remediation

instructed the jury that the plaintiff is entitled only to remediation costs, not damages, unless he or she demonstrates that there was damage that was not reasonably curable by repair. Id. at 273. We note, however, that our decision in Hill did not address the accuracy of the jury instructions, because the unobjected-to jury instructions became the law of the case. Id. at 275.

and the different possible levels of cleanup required, G. L. c. 21E provides for separate and distinct recovery for response costs under § 4 and property damages under § 5, and sets out two different statutes of limitations depending on whether the cause of action arises under § 4 or § 5.  See G. L. c. 21E, § 11A; Guaranty-First Trust Co. v. Textron, Inc., 416 Mass. 332, 338 (1993).  We examine these causes of action, and their particular purposes, to inform our understanding of the statute of limitations under § 11A.

  a.  Private causes of action under G. L. c. 21E.  The primary purpose of G. L. c. 21E is to clean up environmental contamination, and to pay for the costs associated with that cleanup.  See Taygeta Corp., 436 Mass. at 223.  Accordingly, the statutory and regulatory scheme prioritizes the performance and financing of cleanup efforts, and then considers the calculation of property damage that cannot be cured by remediation and remediation cost recovery.  See id. (remediating environmental contamination is primary purpose of G. L. c. 21E, while compensating owners for property damage is secondary purpose).  Sections 4 and 4A and their corresponding statutes of limitations address the former objective; statutes of limitations under § 5 address the latter.

  In order to perform and pay for effective and efficient remediation, G. L. c. 21E not only mandates that responsible

parties engage in the MCP remediation process, but also provides for private causes of action pursuant to §§ 4 and 4A to recover cleanup costs from other responsible parties. See Taygeta Corp., 436 Mass. at 223. Section 4 allows private individuals to sue for reimbursement of response costs they have already incurred. Section 4A allows private individuals to sue for contribution or equitable share of response costs they have not yet incurred. Thus, whenever a plaintiff's property is contaminated, G. L. c. 21E not only prioritizes environmental cleanup, but also empowers the plaintiff to pursue reimbursement, contribution, or equitable share of the response costs necessary to perform that remediation. Sections 4 and 4A, and not § 5, govern cost recovery for these remediation efforts.

Full remediation of the environmental contamination is a desirable outcome. See 310 Code Mass. Regs. § 40.1020 (2014). If the cleanup and cost recovery process fully remediates the plaintiff's property damage, the plaintiff has suffered environmental contamination without incurring damages under § 5. However, cleanup in accordance with G. L. c. 21E and the MCP may not remediate all of the physical damage to a site, particularly in cases of significant environmental contamination, as full remediation may be cost prohibitive. See 310 Code Mass. Regs. § 40.0860(7)(a) (2014). See also Department of Environmental Protection, Conducting Feasibility Assessments under the MCP,

Policy No. WSC-04-160, at 17 (July 16, 2004) (remediation necessary to reach background levels not feasible if it costs more than twenty per cent of cost of remediation necessary to reach level of "No Significant Risk").  Cf. Guaranty-First Trust Co., 416 Mass. at 338.  In those instances, remediation and the recovery of response costs pursuant to §§ 4 and 4A may not fully compensate plaintiffs for the harm they have suffered.

Section 5 provides for recovery of this type of residual damage that cannot be cured or compensated by remediation or the recovery of response costs.  Damage may be residual, in that the property, even after undergoing the cleanup mandated by the MCP process, may still contain pollutants diminishing the fair market value of the property.  Bisson v. Eck, 40 Mass. App. Ct. 942, 942 (1996) (jury could find "residual levels of hazardous materials persisted on the property despite the plaintiff's cleanup efforts" for purposes of claim under § 5).  The plaintiff may have also suffered temporary loss of use and resulting economic damage, such as lost rent, that again cannot be cured or compensated by remediation and response costs.  Guaranty-First Trust Co., 416 Mass. at 336-337.[12]  In

---

[12] Although the phrase "not reasonably curable by repair" is often synonymous with "permanent" at common law, see Belkus v. Brockton, 282 Mass. 285, 287-288 (1933) (measure of damages at common law depends on whether injury is permanent or reasonably curable by repairs), the terms are not interchangeable to describe damages under G. L. c. 21E, § 5.  In Guaranty-First

both instances, the plaintiff's recovery under § 5 is limited to those residual damages that are not cured by the remediation process and cleanup cost recovery available under §§ 4 and 4A.

Prior cases have highlighted the importance of the residual nature of the relationship between damages under § 5 and response costs under §§ 4 and 4A. Hill v. Metropolitan Dist. Comm'n, 439 Mass. 266, 273 (2003) (jury instruction that "if the damage to the plaintiff's property can reasonably be cured, can reasonably be repaired, remediated, then the plaintiff, instead [of getting damages under § 5], gets the expense of doing those repairs, of doing that remediation"); Black v. Coastal Oil New England, Inc., 45 Mass. App. Ct. 461, 466 (1998) ("to the extent that the expense of cleanup was recoverable at the time of this action [because contamination was reasonably curable and there were no loss of use damages], that recovery could be pursued only under § 4"); Bisson, 40 Mass. App. Ct. at 943 ("if remedial measures did not completely cure the problem and the fair market value of the property was less or diminished due to this prior

_____

Trust Co. v. Textron, Inc., 416 Mass. 332, 337 (1993), we held that § 5 provides for recovery of damages due to loss of rent during the period reasonably needed to repair the property. Thus, the environmental damage to the property was not permanent, but recovery was still permissible under § 5 because the damages were not curable or compensable through remediation and repair costs alone. The Massachusetts Contingency Plan (MCP) also uses the terms "permanent" and "temporary" to classify response action outcomes, and those terms have specific meanings in the MCP entirely separate from our discussion here. See 310 Code Mass. Regs. §§ 40.1000 (2014).

existing contamination, then the plaintiff would be entitled [to recover for the property's] diminution in value" [quotation omitted]).  The statute thus prioritizes cleanup and response costs while still ensuring full recovery.  This approach also guards against double recovery for environmental contamination. See Guaranty-First Trust Co., 416 Mass. at 338.  See also Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 415 Mass. 865, 870 (1993) ("Recovery of duplicative damages under multiple counts of a complaint is not allowed").[13]

b.  The statutes of limitations of §§ 4, 4A, and 5.  The statute of limitations for a private cause of action under G. L. c. 21E is governed by G. L. c. 21E, § 11A.  Prior to 1992, G. L. c. 21E did not include a statute of limitations, and Massachusetts courts were left to determine which existing statutes of limitations applied to G. L. c. 21E claims. See Oliveira v. Pereira, 414 Mass. 66, 72-73 (1992) (pre-1992 action brought under G. L. c. 21E, § 4, fell under statute of limitations for torts, G. L. c. 260, § 2A).  In 1992, G. L. c. 21E underwent significant reform, including the enactment of

---

[13] As explained above, the statute prioritizes cleanup over calculating the property damage that will remain after such cleanup has been completed.  The statute therefore disallows the conversion of future cost recovery expenses under §§ 4 and 4A into claims for present property damages under § 5.  Black v. Coastal Oil New England, Inc., 45 Mass. App. Ct. 461, 465-466 (1998) ("diminution in value analysis generally has no place in assessing the cost of remediation for temporary injury" [footnote omitted]).

§ 11A.  See St. 1992, c. 133, §§ 271-313.  According to the department, § 11A was added as part of this reform to "more comprehensively establish statutes of limitations for actions filed under [G. L. c.] 21E."  See Department of Environmental Protection, The Massachusetts Oil & Hazardous Materials Release, Prevention & Response Act, 1992 Amendments to Chapter 21E (July 22, 1992).

As discussed, § 11A must be analyzed within the context of G. L. c. 21E and the MCP.  Taygeta Corp., 436 Mass. at 226. Chapter 21E provides multiple causes of action, and § 11A sets out different statutes of limitations for each one.  Because G. L. c. 21E prioritizes cleanup, and cleanup under the MCP can take many years, the statute of limitations for causes of action that support such cleanup is generous.  Specifically, for claims brought under § 4 or 4A, the suit need only be filed within three years of the latest of four events, one of which is the date when the plaintiff has "incur[red] all response costs." G. L. c. 21E, § 11A (2).  Thus, a plaintiff who has conducted remediation activities can bring suit up to three years after he or she finishes remediating the property.

Individuals who intend to bring a claim under § 5 (a) (iii) must do so within three years of when they discover or reasonably should have discovered the damage and the party liable under G. L. c. 21E for such damage.  Taygeta Corp., 436

Mass. at 226. Here, the relevant question is whether the word "damage" in § 11A (4) refers specifically to damage under § 5, that is, damages that cannot be cured and compensated by the cleanup and cleanup cost recovery processes defined by the MCP and §§ 4 and 4A, such that the limitations period does not begin to run until the plaintiff knows there is residual damage not subject to such remediation and compensation. We conclude that the reference to damages in both provisions refers to the same residual claim.[14]

As discussed, a plaintiff suffers damage within the meaning of § 5 (a) (iii) if there is damage that is not curable through the cleanup and cleanup cost recovery process defined by the MCP and §§ 4 and 4A. Thus, if a plaintiff is to have notice of a claim under § 5 for statute of limitations purposes, the plaintiff must have knowledge that he or she suffered damage that is not curable by the MCP remediation process. See Olsen v. Bell Tel. Labs., Inc., 388 Mass. 171, 175 (1983) ("[T]he court has been guided by the principle that a plaintiff should be put on notice before his or her claim is barred by the passage of time"). Such notice is generally not provided until

---

[14] We note that the MCP provides no express guidance on the meaning of § 11A (4), as the MCP does not address suits initiated by private individuals. 310 Code Mass. Regs. § 40.1201(3) (2014). Nor does the MCP address suits initiated by the Commonwealth for damage to property. See 310 Code Mass. Regs. §§ 40.0002(5), 40.1201(1) (2014).

the MCP process is sufficiently advanced to identify residual property damage.

This understanding of the statute also comports with the over-all statutory scheme, which imposes deadlines for assessing the extent of a site's damage.  See Taygeta Corp., 436 Mass. at 227 ("An interpretation of the statute of limitations that imposes on plaintiffs an obligation to investigate their property in advance of a defendant's completion of the requisite assessment would be contrary to the statutory and regulatory scheme").  The liable party is required to determine the full extent of the damage in its Phase II report, and analyze and choose from among the available remedies in its Phase III report.  310 Code Mass. Regs. §§ 40.0835(4)(b), 40.0853 (2014). It would make little sense to require a plaintiff to independently determine whether residual property damage exists prior to the completion of those reports.  See Taygeta Corp., 436 Mass. at 227 ("There is nothing unreasonable in a plaintiff's decision not to go forward with an assessment duplicating the work that the defendant is already obligated to perform").[15]

---

[15] As claims of loss of use are tied to the "period of time reasonably necessary to repair the damage," these claims are also dependent on the remediation process.  Guaranty-First Trust Co., 416 Mass. at 333, 339.  The Phase II and Phase III reports required pursuant to the MCP therefore lend necessary clarity to such claims as well.  For this reason, and to avoid splitting

Adopting this understanding of the statute of limitations for claims under § 5 (a) (iii) also provides a "prescribed and predictable period of time" within which such claims would be time barred. Olsen, 388 Mass. at 175. A Phase III report must be submitted within four years of the site's tier classification.[16] 310 Code Mass. Regs. § 40.0560(2)(c) (2014). Accordingly, a plaintiff will typically know whether he or she has a cognizable claim under § 5 (a) (iii) within five years of notifying the department of the contamination.

Requiring claims under § 5 to be filed before it is clear whether there is any residual damage not curable pursuant to the MCP cleanup process would also make little sense. If the limitations period for § 5 begins as soon as a plaintiff learns of contamination, he or she could be forced to bring suit before knowing whether there is a cognizable claim under § 5 (a) (iii). Plaintiffs would be put in the difficult position of choosing between whether to sue immediately, and potentially recover nothing, or to wait for more information, and potentially find their claim under § 5 time barred. This makes even less sense

---

claims under § 5, the statute of limitations for claims under § 5 should be uniformly defined.

[16] A site must undergo a tier classification within one year of notifying the department of the release of hazardous materials or one year of the department issuing a notice of responsibility, whichever is earlier. 310 Code Mass. Regs. § 40.0404(3) (2014).

when plaintiffs may also have a claim under § 4 or 4A that could be brought years later, including after the remediation process is completed. Requiring plaintiffs to bring a claim under § 5 (a) (iii) early in the assessment and remediation process, before clarification of whether there is residual property damage, and certainly any realistic understanding of the extent of that damage, would therefore be wasteful for both the parties and the court system.

The city contends that this case is "functionally identical" to the facts in Taygeta Corp., and that Taygeta Corp. subverts this interpretation of § 11A (4). We disagree. In that case, hazardous materials migrated from the defendant's property to the plaintiff's property by way of subsurface groundwater contamination. Taygeta Corp., 436 Mass. at 219-220, 228. We held that the statute of limitations did not begin to run until the plaintiff had received test results indicating that its groundwater was contaminated and resembled groundwater samples taken from the defendant's property. Id. at 228. However, the record in Taygeta Corp. indicates that both parties stipulated prior to trial that the plaintiff's property suffered permanent damage. Thus, the central issue was not whether the damage was not reasonably curable by repair, but whether a plaintiff's suspicions about possible contamination created a duty to investigate that could trigger the limitations period.

Additionally, our decision in Taygeta Corp. stressed the importance of the MCP process for identifying the appropriate trigger for the statute of limitations, a principle we reaffirm today.  See id. at 225-227.

In the instant case, no one had knowledge of whether the damage was reasonably curable more than three years before the plaintiffs filed suit.  The initial soil test results that notified the plaintiffs of the contamination found hazardous materials only in one of the two soil samples, indicating the contamination may have been limited to that stockpile location.  Even after attempting a limited removal action, the association's licensed site professional indicated that the extent of the contamination was unknown.  At best, the city learned of the scope of the contamination, and that such contamination could not be fully remediated, when the geophysical report was completed, sixteen months before the plaintiffs filed suit.  That information was not available to the plaintiffs until the city submitted its Phase II and Phase III reports, four months before the plaintiffs filed suit.  Accordingly, the plaintiffs' suit was timely as a matter of law.[17]

---

[17] Because we conclude that the plaintiffs' § 5 (a) (iii) claim was timely as a matter of law, we need not address the plaintiffs' argument that the jury instructions on the burden of persuasion were in error.

3.  <u>Conclusion</u>.  For the reasons discussed, we hold that as a matter of law the plaintiffs' claim under § 5 (<u>a</u>) (iii) was not time barred.  The judgment is vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.